IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

| | | |
|---|---|---|
| DARRYL DANA THOMAS, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 321-082 |
| | ) | |
| KAREN THOMAS, Unit Manager, and | ) | |
| JACOB BEASLEY, Deputy Warden of | ) | |
| Security, | ) | |
| | ) | |
| Defendants. | ) | |

---

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

---

Plaintiff, an inmate at Washington State Prison in Davisboro, Georgia, is proceeding *pro se* and *in forma pauperis* ("IFP") in this civil rights case concerning events at Telfair State Prison. Defendants move for summary judgment, and Plaintiff opposes the motion. For the reasons set forth below, the Court **REPORTS** and **RECOMMENDS** Defendants' motion for summary judgment be **DENIED**. (Doc. no. 47.)

## I.    PROCEDURAL BACKGROUND

Because Plaintiff is proceeding IFP, the Court screened his pleadings pursuant to 28 U.S.C. §§ 1915(e) & 1915A. In a Report and Recommendation ("R&R") issued on April 8, 2022, the Court recommended Plaintiff's case be dismissed for failing to state a claim upon which relief can be granted and seeking monetary relief where none is available. (Doc. no. 13.) In response to the Court's R&R, Plaintiff requested and received permission to amend his amended complaint in an attempt to cure the deficiencies identified in the R&R. (See doc.

nos. 15 -17.)  Upon submission of a second amended complaint, the Court vacated the April

8th R&R and permitted Plaintiff to proceed with an Eighth Amendment excessive force claim

against Defendants Thomas and Beasley.  (See doc. nos. 21, 23, 26.)  All other claims were

dismissed.  (See doc. nos. 24, 32.)  Notably, because Plaintiff had alleged his excessive force

claims as a continuing event from the spraying of oleoresin capsicum ("OC") spray through

the alleged failure to allow him to decontaminate, the Court treated his claim as one Eighth

Amendment claim for excessive force; the Court did not permit separate, stand-alone claims

to go forward based solely on the allegations related to visits, or the lack thereof, from medical

personnel.[1]

In a motion filed on the docket after the close of the discovery period and one day after

Defendants filed their motion for summary judgment, Plaintiff requested discovery be re-opened

for thirty days.  (See doc. nos. 47, 50.)  After determining Plaintiff had not shown good cause to

modify the case deadlines and confirming Plaintiff had been allowed to view the video of the

incident forming the basis for this lawsuit, the Court denied the motion to re-open discovery,

explained the requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985), and

---

[1]The Eleventh Circuit recognizes different tests for distinct Eighth Amendment claims of cruel and unusual punishment, use of excessive force, and deliberate indifference to serious medical needs.  See Danley v. Allen, 540 F.3d 1298, 1306 (11th Cir. 2008) (identifying different types of Eighth Amendment claims and application of separate test for each type), *overruled in part on other grounds as recognized by* Randall v. Scott, 610 F.3d 701, 709 (11th Cir. 2010).  The Eleventh Circuit also recognizes that "[t]he plaintiff is the master of the complaint," and will, under appropriate circumstances, treat "nearly simultaneous actions [as] interrelated parts of a single course of conduct."  Id. at 1306, 1307.  As discussed in more detail below, Plaintiff's allegations of Defendants administering OC spray into his cell and then not allowing him to decontaminate for an extended period of time are analyzed as a single excessive force claim.  See id. at 1306.

granted Plaintiff an extension of time to respond to the summary judgment motion.[2]   (See doc.

no. 52.)

In accordance with Local Rule 56.1, Defendants submitted a Statement of Undisputed

Material Facts in Support of Their Motion for Summary Judgment ("SMF").  (Doc. no. 47-2.)

Plaintiff's opposition "disputes" Defendants' SMF, but does not address each fact in the SMF.

(Doc. no. 53.)   However, Plaintiff's response does contain a "Declaration in Opposition of

Summary Judgment," (id. at 10-11), and the record includes Plaintiff's second amended

complaint verified pursuant to Fed. R. Civ. P. 11, (doc. no. 21), as well as Plaintiff's deposition,

(doc. no. 55), and a video of the disputed incident, (doc. no. 47-7.)  The Court deems admitted

all portions of Defendants' SMF that have evidentiary support in the record and are not

properly opposed by Plaintiff as contemplated under Fed. R. Civ. P. 56.  See Loc. R. 56.1; Fed.

R. Civ. P. 56(e); see also Williams v. Slack, 438 F. App'x 848, 849-50 (11th Cir. 2011) (per

curiam) (finding no error in deeming defendants' material facts admitted where pro se prisoner

failed to respond with specific citations to evidence and otherwise failed to state valid

objections); Scoggins v. Arrow Trucking Co., 92 F.Supp.2d 1372, 1373 n.1 (S.D. Ga. 2000) )

(deeming admitted all unopposed fact statements supported by the evidentiary materials of

record).

However, this does not automatically entitle Defendants to summary judgment because

as the movants, they continue to "shoulder the initial burden of production in demonstrating

the absence of any genuine issue of material fact." Reese v. Herbert, 527 F.3d 1253, 1268

---

[2]The Clerk of Court also issued a notice concerning the summary judgment motion and
summary judgment rules, the right to file affidavits or other materials in opposition, and the
consequences of failing to comply with the requirements for responding.  (See doc. no. 49.)  As
Plaintiff has received multiple notices regarding Defendants' summary judgment motion, the
Griffith notice requirements are satisfied.

(11th Cir. 2008); see also Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1303 (11th Cir. 2009).

Thus, the Court will review the record "to determine if there is, indeed, no genuine issue of

material fact." Mann, 588 F.3d at 1303.

## II.    FACTS

### A.    Undisputed Facts

On September 29, 2021, Defendant Thomas was the Unit Manager at Telfair State Prison

("TSP"), and Defendant Beasley was the Deputy Warden of Security at TSP.  SMF ¶¶ 1, 2.

Plaintiff was housed in cell E1-137 in the E dormitory at TSP.  SMF ¶ 6.  Plaintiff's cell was a

"closed front cell" consisting of a full, solid piece of metal with a small window and small tray

flap.  SMF ¶ 7.  The tray flaps can be locked from the outside by moving a metal slide across the

tray flap, and if the tray flap is unlocked, an inmate inside the cell can push the flap open and keep

it open with his arm or other object.  SMF ¶¶ 8, 9.  If an inmate's arm or other type of object is in

the tray flap, the flap cannot be closed and locked from the outside.  SMF ¶ 10.  TSP staff unlock

the tray flaps to pass food trays to the inmates, but leaving the flaps unlocked poses a security risk

because an inmate may reach through the flap with the intent to harm someone outside the cell

with a homemade weapon or by throwing something at staff.  SMF ¶¶ 11, 12.  To limit security

threats to staff, TSP staff close and lock the tray flaps as much as possible.    SMF

¶ 13.

On September 29th, when Defendant Thomas arrived at Plaintiff's cell with the OC spray,

Plaintiff had his arm in the tray flap, preventing it from being closed and locked.    SMF

¶ 14; doc. no. 55-1, Pl.'s Dep., pp. 11, 13.[3]  Beyond these basic facts, the parties hotly contest the

---

[3]The Court cites to the page number assigned by the CM/ECF filing system at the top of
the page rather than the page number assigned by transcription of the deposition.

other details of the use of OC spray on Plaintiff and subsequent events once he removed his arm from the tray flap.  Therefore, the Court first recounts the events depicted on the video of the use of force incident recorded by a TSP staff member, (SMF ¶ 15; doc. no. 47-7, Thomas Decl., Ex. A, Video; Pl.'s Dep., p. 13; Pl.'s Rsp., pp. 2-5), then turns to Plaintiff's and Defendants' conflicting version of events.

### B.      Video

The video Defendants submitted in support of their summary judgment motion provides a clear and unobstructed view of the events inside the dormitory, but outside Plaintiff's cell, related to the use of force incident.  (See Thomas Decl. Ex. A.)  The video starts with Defendant Thomas incorrectly stating the date is September 30, 2021, but the date is actually September 29, 2021. (Thomas Decl. ¶ 6.)  Defendant Thomas also states Plaintiff has refused to close his tray flap, and he would be given one more warning to comply before OC spray would be administered.  From the 35 to 41 second mark, Defendant Thomas tells Plaintiff three times to close his flap.  When he does not comply, Defendant Thomas administers a one-second spray through the tray flap at the 46 second mark.  Plaintiff's arm remains in the flap.

At the 2:02 mark, Defendant Thomas opens the flap enough for the book propped in the flap to fall, but Plaintiff's arm remains in the flap.  Defendant Thomas leaves the screen at the 2:06 mark.  Defendant Beasley - coughing and covering his mouth with a rag while holding a canister of OC spray - looks through Plaintiff's cell window at the 3:58 mark, while Plaintiff's arm is still in the flap.  When Defendant Beasley leaves the screen at the 4:25 mark, voices in the background can be heard yelling, "They're going to the back window," but the video does not actually show anything other than the front of the cell door.  Plaintiff props another object in the flap at the 5:08 mark and leaves his arm in the flap.  While both Defendants are off screen, Plaintiff sticks a piece

of paper out of the cell at the 6:58 mark, but the Court is unable to make out what may be written on the paper.[4]

At the 9:12 mark, Defendant Beasley approaches Plaintiff's cell with a Taser drawn, at which time Plaintiff removes his arm before the Taser is employed.  The flap is closed and locked. Defendants then leave the cell block, and from the 9:46 mark until 10:00, Defendant Thomas recounts a summary of events, states medical has been called, and states Plaintiff will be given an opportunity to decontaminate inside his cell.  The video ends and does not present any visual depiction of medical personnel at Plaintiff's cell or decontamination activity.

### C.    Plaintiff's Version

On September 29, 2021, Plaintiff had been sharing a cell with another inmate.  (Doc. no. 21, p. 12, 2d Am. Compl.)  Upon finishing his shower, Plaintiff learned his cellmate was refusing to let him back into the cell, so CERT team members removed the cellmate, and in the process removed some of Plaintiff's personal property.  (Id.)  Plaintiff attempted to speak to Defendant Thomas about his missing property, but when she dismissed his concerns, Plaintiff "became indignant and refused to allow his flap to be secured."  (Id.; Pl.'s Dep., pp. 11-12.)  Defendant Thomas then left the unit, returned with another officer who was recording the interaction, and without warning, immediately administered OC spray.  (Pl.'s Dep., pp. 13, 23.)  When Plaintiff "continued to protest by indignation," (2d Am. Compl., p. 12), approximately two minutes after the first spray, Defendant Thomas administered a second OC spray through the flap, (Pl.'s Dep., pp. 14, 24).

When Defendant Thomas realized Plaintiff "was steadfast in [his] protest," (2d Am.

---

[4]As discussed below in Plaintiff's version of events, he asserts the paper is a sign requesting the return of his missing property.

Compl, p. 12), she called for Defendant Beasley, who, upon entering the dormitory approximately two minutes after he was called, approached Plaintiff's door, took the OC canister from Defendant Thomas and immediately administered OC spray into Plaintiff's flap.  (Id. at 12-13; Pl.'s Dep., pp. 14, 25.)  Plaintiff did not remove his arm from the flap, and seeing Plaintiff's "persistence to protest," (2d Am. Compl., p. 13), both Defendants exited the dormitory and administered more OC spray through Plaintiff's outside, back cell window, which made it harder for him to breathe, (id. at 13, 15; Pl.'s Dep., pp. 15, 25).  While Defendants were outside, Plaintiff scribbled a sign that he showed to the camera that read, "MY PROPERTY WAS STOLEN I WANT IT BACK." (2d Am. Compl., p. 13.)  Both Defendants then returned to the inside of the dormitory, and when Defendant Beasley approached Plaintiff's cell with a Taser, Plaintiff withdrew his arm before he was tased.  (Id.; Pl.'s Dep., pp. 14-15.)

Defendant Thomas then closed and locked the flap, and both Defendants exited the dormitory.  (2d Am. Compl., p. 13.)  Plaintiff had no fresh air in his cell after the flap was closed, and because of a maintenance issue in his cell, he had no running water with which to wash off the OC spray.  (Id.)  Plaintiff alternately states he did, (doc. no. 53, p. 5), or did not, (2d Am. Compl., p. 13), have an opportunity to tell either Defendant about the lack of running water in his cell. Plaintiff was unable to shower off the OC spray the day it was administered, Wednesday, September 29th, or the following day, because Thursday was not a scheduled shower day.  (Doc. no. 53, p. 2.)  Running water was not restored in Plaintiff's cell until October 2nd.  (2d Am. Compl., p. 14.)

When Defendants exited the dormitory, they ignored Plaintiff's cries for medical attention, which is a violation of prison policy.  (Id. at 13.)  According to Policy Number 209.04 attached to Plaintiff's second amended complaint, if a prisoner is exposed to contamination as part of a use of

force incident, he is to be removed from the contaminated area and exposed to fresh air, the resin is to be removed from the prisoner's skin by placing him under running cold water as soon as possible and if showering is not an option, wet paper towels shall be provided and eyes shall be flushed liberally with cool water.  (Id., Ex. 3.)  Medical staff shall examine the prisoner exposed to chemical agents as soon as practicable.  (Id.)  However, no medical personnel examined Plaintiff the day the OC spray was administered, or any day thereafter until a nurse examined him through his cell door on October 6, 2021.  (Pl.'s Dep., pp. 17-19.)  Plaintiff reported having swollen eyes for three to four days after the incident, a sore throat, and difficulty breathing for "about 24 hours."  (Id. at 17.)  Plaintiff did not need any medical treatment by the time he saw the nurse on October 6th.  (Id. at 19.)

### D. Defendants' Version

On September 29, 2021, at approximately 2:55 p.m., Plaintiff had refused several direct orders to remove his arm from the unlocked tray flap on his cell so that the flap could be closed and locked.  (Thomas Decl. ¶ 5; doc. no. 47-4, Beasley Decl. ¶ 5.)  Therefore, a TSP officer began recording a video of Defendant Thomas's interaction with Plaintiff, which included the statement Plaintiff would be given one more warning to remove his arm from the tray flap before OC spray would be administered.  (Thomas Decl. ¶ 6; Beasley Decl. ¶ 6.)  Using OC spray on an inmate refusing to remove his arm from the tray flap is the least dangerous method to gain compliance for both prison staff and the inmate, as the inmate will experience a burning sensation on any uncovered part of his body and in his eyes, nose, mouth, and lungs, thereby removing the ability to physically resist prison staff.  (Thomas Decl. ¶ 6; Beasley Decl. ¶ 6; doc. no. 47-5, Lewis Decl. ¶ 4.)  The physical effects of the OC spray are short-lived, and the use of OC spray does not cause long-term physical damage to the inmate.  (Thomas Decl. ¶ 6; Beasley Decl. ¶ 6; Lewis Decl.

¶ 4.)  Attempting to enter Plaintiff's cell or force his arm back out of the tray flap without first using OC spray would have resulted in an increased risk of serious injury to Plaintiff and prison staff.  (Thomas Decl. ¶ 6; Beasley Decl. ¶ 6.)

Upon entering the dormitory after the video recording started, Defendant Thomas gave Plaintiff three warnings to close his tray flap, but he refused, resulting in Defendant Thomas administering one short burst of OC spray into Plaintiff's cell through the open flap.  (Thomas Decl. ¶ 7.)  This was the only OC spray administered into Plaintiff's cell on September 29, 2021, and at no time did Defendant Beasley use or order the use of OC spray through the back air vent on Plaintiff's cell.[5]  (Beasley Decl. ¶ 11.)  After the one spray through Plaintiff's tray flap, he refused to remove his arm from the flap.  (Thomas Decl. ¶ 8.)  Defendant Beasley also directed Plaintiff to remove his arm from the flap, but Plaintiff refused to do so until Defendant Beasley came to Plaintiff's cell door with his Taser drawn, at which time Plaintiff removed his arm and allowed the tray flap to be locked from the outside.  (Thomas Decl. ¶ 9; Beasley Decl. ¶ 9.)

Next, Defendant Thomas stated Plaintiff's flap had been secured, the medical department had been notified to examine Plaintiff, and Plaintiff would be allowed to decontaminate inside his cell.  (Thomas Decl. ¶ 9.)  Plaintiff's cell had a sink and air vent at the back of the cell to allow outside air to circulate through the cell and under the bottom of the cell door.  (Thomas Decl. ¶ 10; Beasley Decl. ¶ 10.)  TSP medical staff examined Plaintiff through his cell door rather than in the medical department on September 29th because Plaintiff continued to be aggressive and a security concern "for some time after his tray flap was closed."  (Thomas Decl. ¶ 11.)  Even though the Use of Force Medical Exam is dated October 6, 2021, Defendant Thomas personally observed TSP staff examine Plaintiff through his cell door on September 29th.  (Id.)  Defendant Beasley

---

[5] It appears this back air vent is what Plaintiff refers as the back window of his cell.

played no role in any decision about whether Plaintiff would stay in his cell or how Plaintiff would be examined by TSP medical staff.  (Beasley Decl. ¶ 9.)

Plaintiff was not allowed to leave his cell to decontaminate because (1) he continued to be verbally aggressive after his tray flap was closed, (2) there are only six, one-man showers in the E-1 lockdown dormitory, and (3) safety and security concerns dictate that individual inmates must have two officers escort them to the showers.  (Thomas Decl. ¶ 12.)  As a result of security considerations, Plaintiff did not immediately shower after the use of OC spray, "but was taken to the shower as soon as practicable considering the circumstances."  (Id.)  Inmates in the E-1 dormitory at TSP shower on Mondays, Wednesdays, and Fridays, and because the OC was used against Plaintiff on a Tuesday afternoon, he would have taken a shower the next day.  (Thomas Decl. ¶ 11.)  However, the Court takes judicial notice of the 2021 calendar,[6] which shows September 29, 2021, was a Wednesday, meaning Plaintiff would not have been able to take a shower until over twenty-four hours later at some point on Friday, October 1, 2021.[7]

Defendants have also produced a declaration from Dr. Sharon Lewis, the Statewide Medical Director for the Georgia Department of Corrections, analyzing the effects of OC spray on Plaintiff's health.  (Lewis Decl. ¶ 2.)  The declaration has attached select portions of Plaintiff's medical records, including, *inter alia*, a medical encounter form dated September 30, 2021, which describes a sharp pain in his chest pre-dating the use of OC spray, and a Use of Force Assessment

---

[6]Under Federal Rule of Evidence 201(b), the Court may take judicial notice of the 2021 calendar.  See Walker v. Indian River Transp. Co., 741 F. App'x 740, 743 n.3 (11th Cir. 2018) (*per curiam*).

[7]Indeed, Plaintiff explained the whole episode started when he was returned from the showers the morning of September 29, 2021, and found his property missing after CERT team members had removed his cellmate who was refusing to let Plaintiff back into the cell.  (2d Am. Compl., p. 12.)

dated October 6, 2021, showing no injuries. (Lewis Decl., Exs. A & B.) The Court need not parse the facts of these medical records at this point, however, because there is no claim in this case of deliberate indifference to a serious medical need, and as discussed below, the significance of any injury incurred by Plaintiff is a matter for the jury.[8] It is enough to acknowledge that Dr. Lewis has explained the temporary effects of OC spray and provided medical records which comport with Plaintiff's report that he did not need treatment related to the OC spray after October 6, 2021. (Lewis Decl. ¶ 4, Exs. A-F; Pl.'s Dep., p. 18.)

## III.   DISCUSSION

### A.      Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1244 (11th Cir. 2003) (citation omitted).

If the burden of proof at trial rests with the movant, to prevail at the summary judgment stage, the movant must show that, "on all the essential elements of its case . . . , no reasonable jury could find for the nonmoving party." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc). On the other hand, if the non-moving party has

---

[8] While Plaintiff does complain he was not examined by medical personnel immediately after the use of force, he did not make a medical deliberate indifference claim and in particular, has never claimed that either Defendant was subjectively aware of, but disregarded, a serious risk to Plaintiff's health by following a course of action constituting more than mere negligence. See Melton v. Abston, 841 F.3d 1207, 1220, 1223 (11th Cir. 2016) (per curiam). Indeed, while the parties dispute when medical personnel first examined Plaintiff after the use of the OC spray, Plaintiff himself concedes he did not need any additional treatment after October 6, 2021, related to the OC spray. (Pl.'s Dep., p. 18.)

the burden of proof at trial, the movant may prevail at the summary judgment stage either by negating an essential element of the non-moving party's claim or by pointing to specific portions of the record that demonstrate the non-moving party's inability to meet its burden of proof at trial.  Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).

If the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  Id. at 608.  The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint.  Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).  Rather, the non-moving party must respond either by affidavits or as otherwise provided in Fed. R. Civ. P. 56.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (quoting Adickes, 398 U.S. at 158-59).  A genuine dispute as to a material fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.

## B.    Defendants Are Not Entitled to Summary Judgment

Defendants contend they are entitled to summary judgment for three reasons: (1) Plaintiff cannot satisfy the subjective component of an Eighth Amendment excessive force claim; (2) they are entitled to the protection of qualified immunity; and (3) Plaintiff's claim for compensatory damages is barred because he did not sustain more than *de minimis* physical injury.  (Doc. no. 47-1, pp. 9-19; doc. no. 48-1.)  Plaintiff opposes the motion based on his contention that even though he refused to follow instructions to allow his tray flap to be closed,

because his disobedience was not "combative or threatening," Defendants should not have administered multiple rounds of OC spray and should have allowed him to decontaminate after the OC spray had been administered.  (See doc. no. 53.)

### 1.       Overview of the Excessive Force Legal Landscape

"The Eighth Amendment's proscription of cruel and unusual punishments also governs prison officials' use of force against convicted inmates." Campbell v. Sikes, 169 F.3d 1353, 1374 (11th Cir. 1999).  To prevail on an excessive force claim, Plaintiff must satisfy both an objective and subjective component.   Farmer v. Brennan, 511 U.S. 825, 834 (1994). Objectively, Plaintiff must show that he suffered a "sufficiently serious" deprivation harmful enough to establish a constitutional violation. Id. De minimis uses of physical force are beyond constitutional recognition, provided that the use of force is not of a sort "repugnant to the conscience of mankind." Hudson v. McMillian, 503 U.S. 1, 9-10 (1992).  Accordingly, not "every malevolent touch by a prison guard gives rise to a federal cause of action," even if it "may later seem unnecessary in the peace of a judge's chambers . . . ." Id. at 9 (citation omitted).

However, because injury and force are imperfectly correlated and it is the force used that counts, an inmate "who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." Wilkins v. Gaddy, 559 U.S. 34, 38 (2010).  That is, the extent of a plaintiff's injury may be considered, but it is not the central consideration, and "significant injury" is not required to maintain an excessive force claim. Id. at 37.  Thus, the "core judicial inquiry" for an Eighth Amendment excessive force claim is not based on the extent of Plaintiff's injury,

but rather on "the nature of the force" used, *i.e.*, "whether [the force] was nontrivial and 'was applied . . . maliciously and sadistically to cause harm.'"  Id. at 39.

Subjectively, Plaintiff must show that the actions taken involved the unnecessary and wanton infliction of pain.  See Whitley v. Albers, 475 U.S. 312, 319 (1986).  That is,

> [F]orce does not violate the Eighth Amendment merely because it is unreasonable or unnecessary:  "The infliction of pain in the course of a prison security measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense."

Campbell, 169 F.3d at 1374 (quoting Whitley, 475 U.S. at 319).  Rather, the Court must consider "'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'"  Harris v. Chapman, 97 F.3d 499, 505 (11th Cir. 1996) (quoting Hudson, 503 U.S. at 7).

The subjective component analysis narrows the precise inquiry applicable at the summary judgment stage as follows:

> [C]ourts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives.  Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support *a reliable inference of wantonness in the infliction of pain* under the standard we have described, the case should not go to the jury.

Campbell, 169 F.3d at 1375 (quoting Whitley, 475 U.S. at 322).

Because the subjective component is contextual, courts consider the following factors: (1) extent of injury, (2) need for application of force, (3) relationship between need and amount of force used, (4) threat reasonably perceived by the responsible officials, and (5) any efforts made to temper the severity of a forceful response.  Hudson, 503 U.S. at 7; Campbell, 169 F.3d at 1375.  Any action taken should be viewed in light of the wide-ranging deference accorded

prison officials acting to preserve discipline and institutional security. Hudson, 503 U.S. at 6; Fennell v. Gilstrap, 559 F.3d 1212, 1217 (11th Cir. 2009) (*per curiam*), *abrogated on other grounds by* Crocker v. Beatty, 995 F.3d 1232, 1248 (11th Cir. 2021). For example, use of an appropriate degree of force to compel compliance with a valid order is justified. Brown v. Smith, 813 F.2d 1187, 1189 (11th Cir. 1987); see also Ort v. White, 813 F.2d 318, 325 (11th Cir. 1987) (evaluating excessive force claim requires consideration of whether immediate coercive measures were taken "in a good faith effort to restore order or prevent a disturbance, and if the force used was reasonable in relation to the threat of harm or disorder apparent at the time").

Additionally, "even when an initial use of force is constitutionally permissible, continued force is excessive after the prisoner has complied and control has been restored." Williams v. Rickman, 759 F. App'x 849, 853 (11th Cir. 2019) (*per curiam*) (citing Danley v. Allen, 540 F.3d 1298, 1309 (11th Cir. 2008), *overruled in part on other grounds as recognized by* Randall v. Scott, 610 F.3d 701, 709 (11th Cir. 2010)). In the context of use of OC spray, when a plaintiff claims use of OC spray followed by continued confinement without an opportunity to decontaminate the Court may treat these nearly simultaneous actions that are interrelated parts of a single course of conduct as a "continuum of excessive force." Danley, 540 F.3d at 1307; Williams, 759 F. App'x at 852 (considering alleged use of pepper spray and subsequent overnight confinement in contaminated cell as part of continuum of excessive force claim); see also Snellgrove v. Davis, Case No. 1:15cv19, 2016 WL 10518966, at *3 (N.D. Fla. Sept. 9, 2016) (treating failure to decontaminate as part of continuum of excessive force claim).

>  **2.    Reasonable Jurors Could Find Defendants Applied More Than Minimal Force and Acted Maliciously and Sadistically to Cause Harm to Plaintiff Based on the Events Occurring after the Initial Administration of OC Spray**

As an initial matter, the one-second burst of OC spray by Defendant Thomas after Plaintiff refused multiple to commands to remove his arm so that the tray flap could be closed was a permissible, proportionate response to Plaintiff's repeated refusal to obey the command to remove his arm from the tray flap.  See Scroggins v. Davis, 346 F. App'x 504, 505 (11th Cir. 2009) (per curiam) (citing Danley, 540 F. 3d at 1303) (finding two short bursts of pepper spray proportional response to bring prisoner under control).  Indeed, "[p]epper spray is an accepted non-lethal means of controlling unruly inmates," and it is undisputed that "[p]rison guards may use force when necessary to restore order. . . ."  Danley, 540 F.3d at 1307. Furthermore, the Eleventh Circuit has recognized the use of sprays with inflammatory properties may be a reasonable alternative to escalating a potentially dangerous situation without causing permanent injury, particularly when the spray is of a short duration and the recipient is provided adequate decontamination.  See id. at 1307-08;  Burke v. Bowns, 653 F. App'x 683, 696 (11th Cir. 2016) (per curiam).  Moreover, within this District, it has been held that a prisoner's refusal to remove his arm from the tray flap justifies the use of some force. Driver v. Novy, Civ. Act. No. 6:15-cv-55, 2017 WL 2313005, at *3 (S.D. Ga. Mar. 22, 2017) ("Defendant needed to use some measure of force against Plaintiff in an effort to secure his person and obtain Plaintiff's compliance in securing the tray flap-particularly in the face of Plaintiff's repeated refusal."), adopted by 2017 WL 2312835 (S.D. Ga. May 26, 2017).  Here, Defendant Thomas used a minimal, one-second burst of pepper spray in an attempt to obtain Plaintiff's compliance in securing the tray flap.

Moreover, the video clearly shows, contrary to Plaintiff's assertion, that Defendant Thomas gave Plaintiff three warnings to remove his arm from the tray flap before she administered the brief OC spray.  Setting aside for the moment the issue of whether OC spray was administered through the air vent at the back of Plaintiff's cell, Defendants Thomas and Beasley did not administer multiple rounds of OC spray through the flap at the front of Plaintiff's cell.  The Court need not accept Plaintiff's sworn assertions to the contrary.  See Scott v. Harris, 550 U.S. 373, 380 (2007); see also Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1315 (11th Cir. 2010) (per curiam) (explaining where party's version of facts obviously contradicts video, court accepts video depiction).

As to the allegation Defendants put OC spray into Plaintiff's cell through the back air vent, the video is unhelpful because it recorded only the events inside the dormitory and outside of the cell door.[9]  Plaintiff avers Defendants put OC spray through the back cell vent, but Defendants aver they did not.  However, this discrepancy is not material to the Court's resolution of the summary judgment motion because Plaintiff admits he did not remove his arm from the flap after the initial burst of OC spray.  Even viewing Plaintiff's allegations about a second spray as true, the facts are clear that he continued to resist the instructions of Defendants to remove his arm because after Defendants reappear in the video inside the dormitory, Defendant Beasley approaches Plaintiff's cell with a Taser, at which time Plaintiff decides to comply with the direction to remove his arm from the tray flap.  Plaintiff is not tased, the tray is closed and locked from the outside, and there is no longer a prisoner refusing to follow an instruction to remove his arm from the tray flap.  Defendants leave the dormitory.

---

[9]Because of the position of the camera, the video is similarly unhelpful to resolve the dispute over whether Plaintiff had running water inside his cell.

In a continuum of excessive force case such as this one, the Court must also look to what occurred after the use of the OC spray.  See Williams, 759 F. App'x at 852-53.  Plaintiff maintains he alerted both Defendants to the need for medical attention once the tray flap was closed by yelling at them as they walked away and that he attempted to tell Defendant Beasley about the lack of running water in his cell before Defendant Beasley left the building.  Plaintiff has also provided prison Policy Number 209.04 explaining what should be done after the use of OC spray and has averred that policy was not followed.

Defendant Beasley denies he had anything to do with deciding how Plaintiff should be treated after the tray flap was closed, and Defendant Thomas avers she observed medical personnel examine Plaintiff through his cell door.  Plaintiff avers no medical personnel came to his door.  Defendant Thomas states at the end of the video that Plaintiff will be given the opportunity to decontaminate inside his cell, with running water and an air vent at the back of the cell, and she avers that Plaintiff would have had an opportunity to shower "as soon as practicable."  Plaintiff avers his cell had no running water, the back of cell air vent was contaminated with OC spray administered outside by both Defendants, and he did not shower for over twenty-four hours after the incident because the day after the incident was not a regularly scheduled shower day.

Construing the evidence in a light most favorable to Plaintiff, even after he removed his hands from the tray flap and allowed it to be closed, he was left in his cell and unable to decontaminate, as there was no running water in his cell and no fresh air coming through the back air vent.  Taking judicial notice of the 2021 calendar year, as the use of force occurred on a Wednesday afternoon, rather than a Tuesday afternoon as argued by Defendants, Plaintiff was unable to take a shower until Friday, the next scheduled shower day.  He alleges those

conditions caused his eyes to swell, a rash to form on his on his irritated skin, and a severe dry throat.   Although Defendants have argued these are but *de minimis* injuries, the Eleventh Circuit has ruled multiple or permanent injuries are not necessary to sustain an excessive force claim.   McReynolds v. Ala. Dep't of Youth Servs., 204 F. App'x 819, 822 (11th Cir. 2006) (*per curiam*); see also Smith v. Vavoulis, 373 F. App'x 965, 967 (11th Cir. 2010) (recognizing extent of plaintiff's injuries from alleged excessive force, including burning from application of mace, bruises, and other injuries that healed without any medical treatment, provided no basis for dismissing § 1983 claim at summary judgment).

Thus, at this point, of the five factors in the subjective analysis in Hudson, *supra*, under Plaintiff's version of events, at least four favor him because (1) there would be no need to apply force to Plaintiff once he removed his arm from the flap; (2) any use of force would outweigh the absence of any need; (3) Defendants could not have reasonably perceived Plaintiff to be a threat as they locked the flap and walked away; and (4) Defendants would not have reasonably tempered the severity of their response if they left Plaintiff to languish in the continued effects of the OC spray.[10]   Therefore, even if the initial spray by Defendant Thomas was justified because Plaintiff failed to obey the order to allow the tray flap to be closed, a jury could still find more force than was necessary continued to be used after Plaintiff had complied with the instruction to remove his arm so the tray flap could be closed and locked.

Stated otherwise, if Plaintiff's version of events is correct, Defendants subjected Plaintiff to excessive force by continuing to confine him - after he had complied with the order to allow his tray flap to be closed - in a contaminated cell, without access to fresh air or running

---

[10]As discussed herein, a dispute about severity of injuries is not sufficient to dismiss an excessive force claim at the summary judgment stage.

water to get the OC spray off of his skin and out of his eyes, and no opportunity to be examined by medical personnel.  See Danley, 540 F.3d at 1308 ("[S]ubjecting a prisoner to special confinement that causes him to suffer increased effects of environmental conditions -here, the pepper spray lingering in the air and on him- can constitute excessive force."); Williams, 759 F. App'x at 852; see also Williams v. Burton, 943 F.2d 1572, 1576 (11th Cir. 1991) ("The basic legal principle is that once the necessity for the application of force ceases, any continued use of harmful force can be a violation of the Eighth and Fourteenth Amendments, and any abuse directed at the prisoner after he terminates his resistance to authority is an Eighth Amendment violation.").

On the other hand, if Defendants' version of events is correct, they were justified in using force to bring Plaintiff's behavior under control and into compliance with the instruction to remove his arm from the tray flap, and because he was allowed to decontaminate, the use of force was proportional to the circumstance and a good faith effort to restore discipline.  See Brown, 813 F.2d at 1189; Ort, 813 F.2d at 325; see also Burton, 943 F.2d 1576 ("Once it is established that the force was applied in a good faith effort to maintain discipline and not maliciously or sadistically for the purpose of causing harm, the court gives great deference to the actions of prison officials in applying prophylactic or preventive measures intended to reduce . . . breaches of prison discipline." (citations omitted).)

In sum, there is a material, factual discrepancy between the parties concerning the use of the OC spray and any subsequent mitigation efforts concerning the effects of the spray on Plaintiff, and that discrepancy must be resolved by a jury.  See Williams, 759 F. App'x at 854 ("[Plaintiff] has presented sufficient evidence to establish a genuine dispute of material fact as to whether the alleged improper use of pepper spray and the alleged subsequent overnight

confinement in a contaminated cell constituted excessive force under the Eighth Amendment."); Pollock v. Brown, Case No. 3:20-cv-764, 2022 WL 743455, at *7 (M.D. Fla. Mar. 11, 2022) (citing Velazquez v. City of Hialeah, 484 F.3d 1340, 1342 (11th Cir. 2007) (*per curiam*)).

### 3.   Qualified Immunity Does Not Apply, and the Type of Damages Sought Is Not Dispositive

The Court quickly dispenses with Defendants' remaining arguments.  Defendants argue they are entitled to qualified immunity.  (Doc. no. 47-1, pp. 17-19.)  However, a qualified immunity defense is not available on the excessive force claim.  Skrtich v. Thornton, 280 F.3d 1295, 1302 (11th Cir. 2002).  Use of excessive force is clearly established to be a violation of the Constitution.  Hudson, 503 U.S. at 7; Whitley, 475 U.S. at 319.  Because there is "simply no room for a qualified immunity defense when the plaintiff alleges such a violation," the sole question is "whether the plaintiff has alleged facts sufficient to survive a motion to dismiss or a motion for summary judgment."  Skrtich, 280 F.3d at 1301.  As discussed above, there is a material dispute of fact as to the excessive force claim, and thus, summary judgment should be denied to the extent Defendants argue qualified immunity shields them from liability. Bowden v. Stokley, 576 F. App'x 951, 955 (11th Cir. 2014) ("[W]here the plaintiff has sufficiently alleged or shown a material dispute of fact as to an excessive force claim, summary judgment based on qualified immunity is not appropriate.")

Defendants also argue that Plaintiff is not entitled to compensatory damages even if a constitutional violation is found, under the Prison Litigation Reform Act, 42 U.S.C. § 1997e(e), ("PLRA"), because his injuries are *de minimis*.  (Doc. no. 47-1, pp. 9-11; doc. no. 48-1.)

Section § 1997e(e) provides, in pertinent part, as follows: "No federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act." Thus, the PLRA prohibits federal civil actions by prisoners alleging purely mental or emotional injury and no physical injury. Mitchell v. Brown & Williamson Tobacco Corp., 294 F.3d 1312-13 (11th Cir. 2002). To survive application of the § 1997e(e) bar, the physical injury must be more than *de minimis*. Id. at 1213. "The meaning of the phrase 'greater than de minimis,' however, is far from clear." Chatham v. Adcock, 334 F. App'x 281, 284 (11th Cir. 2009) (*per curiam*). In the context of injury resulting from pepper spraying, the Eleventh Circuit has ruled "§ 1997e(e) does not automatically bar compensatory or punitive damages for injuries, like pepper spraying, which normally leave 'no lasting effect[].'" Thompson v. Smith, 805 F. App'x 893, 902 (11th Cir. 2020) (*per curiam*).

Further, although the Eleventh Circuit has not set forth a specific test to decide whether injuries following the use of pepper spray are more than *de minimis*, it has recognized a prisoner can recover for greater than *de minimis* physical injury even if the injury falls short of requiring professional medical attention. Id. at 905 (determining reasonable jury could find injuries exceeded *de minimis* threshold based on claim prisoner was peppered sprayed and left with chemical on face for twenty minutes, experienced difficulty breathing, coughing, and extended burning sensation on skin, was forced into extended shower that exacerbated effects, and returned to contaminated cell for additional day, even if professional medical attention not required); but see Pierre v. Padgett, 808 F. App'x 838, 844 (11th Cir. 2020) (*per curiam*) (explaining recovery of damages under PLRA differs from Eighth Amendment excessive force claim and scrapes, scratches, minor bruising or swelling, or "momentary discomfort" beyond

22

temporary burning sensation from pepper spray does not satisfy requirement for more than *de minimis* physical injury).

Here, Plaintiff alleges more than mental or emotional injury.  He has claimed actual physical injury, though the parties dispute the severity of those injuries.  As aptly explained by another court, "Plaintiff is also seeking damages for the *actual* physical injuries he received from the alleged excessive use of force.  This Court can find no authority limiting a prisoner's damages for the *actual* physical injury he may have suffered, even if the court determines that the injury was *de minimis*."  Nix v. Carter, No. 5:10-cv-256, 2013 WL 432566, at *2 (M.D. Ga. Feb. 1, 2013).  Indeed, other courts have concluded that when there is evidence of some injury, even when healed without treatment, the trier of fact should make the *de minimis* determination.  See Thompson, 805 F. App'x at 905; Cotney v. Bowers, No. 2:03-CV-1181-WKW, 2006 WL 2772775, at *7 (M.D. Ala. Sept. 26, 2006) (finding allegation of bruised ribs after use of fore sufficient to overcome § 1997e(e) bar because there was some evidence from which jury could determine whether injuries more than *de minimis*; see also Thomas v. Hutcheson, Civ. Act. No. 6:14-cv-16, 2015 WL 4378278, at *13-14 (S.D. Ga. July 15, 2015), *adopted by* 2015 WL 5072037 (S.D. Ga. Aug. 26, 2015) (Hall, C.J.); Knighten v. Stanton, No. CA 12-1717-WS-C, 2014 WL 1331026, at *9 (S.D. Ala. Mar. 31, 2014).

Moreover, even if a plaintiff succeeds on an excessive force claim based on an analysis of the nature of the force used in the circumstances, if the evidence reveals a relatively modest nature of alleged injuries, this "will no doubt limit the damages" that may be recovered. Wilkins, 559 U.S. at 40; see also Williams, 759 F. App'x at 853-54 (explaining "the absence of serious or permanent physical harm alone" may "ultimately limit the amount of damages than can be recovered" but does not defeat excessive force claim at summary judgment).

However, at the summary judgment stage, the extent of Plaintiff's alleged injuries should not eliminate the opportunity to seek compensatory damages, particularly as the issue of punitive damages remains even if compensatory damages were removed from consideration. See Hoever v. Marks, 993 F.3d 1353, 1362 (11th Cir. 2021) ("[W]e join several other circuits in determining that § 1997e(e) does not bar punitive damages in the absence of physical injury.").

Thus, summary judgment should be denied on the issue of availability of compensatory damages.

## IV.   CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** Defendants' motion for summary judgment be **DENIED**.  (Doc. no. 47.)

SO REPORTED and RECOMMENDED this 13th day of April, 2023, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA